## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
### NORFOLK DIVISION

JENNIFER MULLEN COLLINS

      **Plaintiff,**

      **v.**                        **CIVIL NO. 2:15cv188**

UNUM LIFE INSURANCE COMPANY
OF AMERICA

      **Defendant.**

### OPINION AND ORDER

This matter comes before the Court on Summary Judgment Motions filed by both the plaintiff, Jennifer Collins ("Ms. Collins" or "Plaintiff"), and the defendant, UNUM Life Insurance Company of America ("Unum" or "Defendant"). ECF Nos. 30, 32. For the forthcoming reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment, ECF No. 32, and **DENIES** Plaintiff's Motion for Summary Judgment, ECF No. 30.

### I.     BACKGROUND

This case arises from the unfortunate death of David M. Collins ("Mr. Collins"), a former Navy SEAL, who took his own life on March 12, 2014. AR033. At the time of his death Mr. Collins was insured under a Supplemental Life Group Life Insurance Policy funded and administered by the defendant Unum. Mr. Collins' widow, Jennifer Collins, was the named beneficiary of the policy. Unum denied Ms. Collins' claim under the policy pursuant to a suicide exclusion within the policy. Ms. Collins now appeals this denial. This case is governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.* ("ERISA").

1

Mr. Collins served in the United States Navy as a SEAL for seventeen years, during which he was deployed to Iraq, Afghanistan, and Kuwait. AR173–75.[1] Mr. Collins served in dangerous and stressful situations. AR198–200, 202–03. He was exposed to enemy gunfire and blasts from mortar fire. AR199, 202. During his deployments, he was frequently sleep-deprived, a condition his colleagues linked both to the stresses of deployment, especially in enemy areas, and to his specific duties, which required him "to be constantly on guard." AR200, 202–03, 220–21.

After retiring from the Navy, on or around September 9, 2012, Mr. Collins began working for Blackbird Technologies ("Blackbird"). AR023, 123, 221. Through Blackbird, Mr. Collins enrolled in two life insurances policies: a basic life insurance policy with $104,000 in coverage that was part of his group benefit plan, and a supplemental life insurance policy with an additional $500,000 in coverage. AR024. The underlying insurer of both plans was Unum Life Insurance Company of America ("Unum"). AR050. It is the supplemental policy, Supplemental Group Life Insurance Policy No. 212563 ("Supplemental Policy"), that is contested in this litigation. Id. As will be discussed, benefits have been paid under the Basic Life Insurance Policy, Policy No. 218750 ("Basic Policy"). See Compl. ¶¶ 90–94, ECF No. 1.

Coverage under the Supplemental Policy began on February 1, 2013. AR130. The policy contained an exclusion for death by suicide, which states in the relevant part:

> Your plan does not cover any loses where death is caused by, contributed to by, or results from:
> - suicide occurring within 24 months after your or your dependent's initial effective date of insurance; and
> - suicide occurring within 24 months after the date any increases or additional insurance becomes effective for you or your dependent.

---

[1] This background is drawn from the administrative record of the insurer's appeal decision affirming its denial of benefits. Administrative Record (to be cited as "AR__"), ECF No. 22. Portions of the record were filed under seal. ECF No. 36.

2

> The suicide exclusion will apply to any amounts of insurance for which you pay all or part of the premium.

AR087–88. The Supplemental Policy also delegates to UNUM "discretionary authority to make benefit determinations under the Plan." AR113. Within the Plan, "[b]enefit determinations include determining eligibility for benefits and the amount of any benefits, resolving factual disputes, and interpreting and enforcing the provisions of the Plan." Id.

Ms. Collins began to notices changes in her husband in the years before his death. AR232. According to her, he became less social and more irritable. Id. He could not concentrate as well as he could before and began to forget things. Id. His friend and co-worker, Herbart "Ali" Gordon Jr. has also noticed changes in Mr. Collins in these years. AR221. Mr. Gordon served as a SEAL alongside Mr. Collins and worked with him at Blackbird. Id. According to Mr. Gordon, Mr. Collins began his employment at Blackbird as his normal "jovial hard working perfectionist self." Id. However, "over time [he] started to see changes." Id. Mr. Collins seemed to Mr. Gordon to be confused and indecisive. Id. He was depressed and withdrawn. Id. Mr. Collins also confided in Mr. Gordon that he was having trouble sleeping. Id. According to Mr. Gordon, these problems were affecting Mr. Collins life at home and at work. Id.

In the beginning of 2014, Mr. Collins sought treatment for these afflictions. He cut short a work trip that began on January 24, 2014 after he was unable to sleep. AR461. He returned home to "figure out what was going on." Id. On February 4, 2014, he went to the emergency room at the Naval Medical Center in Portsmouth, Virginia and complained of anxiety and insomnia. AR438. In response to questioning he answered in the affirmative that he "felt down, depressed, or hopeless," that he had "less pleasure in doing things," and that he had been "losing track of his thoughts." AR440. He was given a mental status exam and found to be "alert and

oriented in all spheres," "open, cooperative, and friendly and maintained good eye contract." AR463.

Mr. Collins was admitted overnight to the inpatient psychiatric ward and given a voluntary psychiatric evaluation. AR438–9, 464. During interviews with psychiatric professionals, he "reported severe anxiety about being able to do his job." AR461. One doctor wrote that "it appears that his anxiety is provoked by work related stresses in the context of . . . suffering a slow decline in memory." AR465. Mr. Collins acknowledged "anxiety about losing his job because he came home from his most recent trip prior to the trip's conclusion." AR476. He also discussed the connection between his work schedule, anxiety about his work, and his insomnia: "I recently doubled shifts this past trip and I keep focusing on work when my friends tell me to take some time to myself . . . I get good sleep when I'm at home though, but I keep telling myself to focus on work." AR483. He hoped that an MRI would give the doctors what they needed to diagnosis him. Id.

The doctors there acknowledged that Mr. Collins had been exposed to "hundreds of subconcussive explosions," which raised concerns of "TBI [traumatic brain injury] with early onset dementia. AR464. They found that his "[m]emory and cognition were impaired," AR463, and that he was "having increasing cognitive difficulties which do not appear to be entirely due to sleep deprivation." AR465. An MRI was performed, which showed that his brain was "within normal limits." AR446. There was a "single nonspecific focus of T2 hypersensitivity in the left frontal lobe." AR482.

Mr. Collins was discharged on February 5, 2014. AR446. Upon release the hospital staff concluded that he was "not considered dangerous to self or others and there was no basis for to refer for involuntary hospitalization." Id. He was "not suicidal, homicidal, or psychotic." Id.

Throughout his hospitalization he had denied suicidal thoughts. Id.; see also AR440, 441, 445, 461.

On February 24, 2014, Mr. Collins began two weeks of treatment at the Carrick Brain Center ("CBC") in Irving, Texas. AR039. The Medical Director of the CBC, Dr. Andre Fredieu, M.D., in a letter authored after Mr. Collins' death on March 31, 2014, reports that Mr. Collins went to the CBC "for treatment of his insomnia, anxiety, [and] difficulties with focus and memory." Id. Dr. Fredieu identified insomnia as one of Mr. Collins' "most significant symptoms." Id. Dr. Fredieu also identified other neurological abnormalities such as tremors, poor coordination, headaches, and hypomania. Id.

While in Texas, on February 27, 2014 and March 6, 2014, Mr. Collins attended two therapy sessions with Drs. Deborah Wade and Tracie Kaip, licensed psychologists at Lifeworks Counseling Center. AR234–38. Dr. Wade diagnosed Mr. Collins with Post-traumatic Stress Disorder, Major Depressive Disorder, and Generalized Anxiety Disorder. AR236. Dr. Wade noted that during their initial meeting Mr. Collins "admitted that he felt an overwhelming sense of sadness, distress . . . ." AR234. He told her that "he has great worry and concern that his job is at risk, that this will burden his family financially . . . ." Id. He had "churning thoughts" of "self-condemnation" that he could not control. AR234–35. He felt that his inability to control these thoughts interfered with his ability to do his job. AR234. Dr. Wade recommended some coping strategies at this first session. AR235. At the second session, Mr. Collins was "visibly improved." AR235. They "continued to address tools which will help to organize his thoughts . . . ." Id. The session ended with "a sense of hopefulness," although "underlying the hope was a wealth of trauma/pain/irrational thought processes that continued to need work to unlock and manage."AR235–36.

On March 10, 2014, Mr. Collins visited Dr. Glenn McDermott, a primary care physician at the Minor Emergency and Family Care Center in Virginia Beach, and complained of insomnia and anxiety. AR415–16. Mr. Collins had previously been seen by Dr. McDermott on January 31, 2014 and February 18, 2014. AR413–14. Mr. Collins told Dr. McDermott that he was only sleeping two to three hours a night. AR416. Dr. McDermott proscribed for him Sonata for insomnia and Lexapro for anxiety. Id.

Mr. Collins took his own life two days later on March 12, 2014. AR209–10, 214. He was found dead in the driver's seat of his car with a gunshot wound to his head and a handgun lying between his legs. Id. The death was ruled a suicide by the Office of the Chief Medical Examiner for the City of Virginia Beach. AR214–16. That day Mr. Collins had sent a text to his wife that read "Pick up Sam . . . . . so sorry baby I. Love u all." AR282. He also had emailed Mike Mansfield, another retired Navy SEAL, writing "I'm in bad times bro. . .please make sure my lovely wife Jennifer and children Sam and Grace are taken care of please. . . .hate to do this to you but you know how to get things done. Take care friend." AR278.

On April 3, 2014, Ms. Collins filed a claim for benefits under both the Supplemental Policy and the Basic Policy. AR018–21, 023–31. Included with the claims were (1) Mr. Collins' Death Certificate, AR033, and (2) the aforementioned March 31, 2014 letter from Dr. Fredieu, AR039–40.

The following entries are contained in the Death Certificate: (1) "Immediate Cause (due to or as a consequence of): Gunshot wound to the head;" (2) "Describe how injury relating to death occurred: Shot self in head with handgun;" and (3) "I certify that I took charge of the remains above, viewed the body, made inquiry and in my opinion death resulted . . . from . . . [x] suicide." AR033.

Dr. Fredieu's letter described the treatment that Mr. Collins received at the CBC after he was admitted on February 24, 2014. AR039–40. It explains that Mr. Collins went to CBC to treat his "insomnia, anxiety, [and] difficulties with focus and memory." AR039–40. After a short summary of testing Mr. Collins performed, Dr. Fredieu stated that his "personal history and clinical exam demonstrated cerebral and cerebellar dysfunction secondary to TBI [Traumatic Brain Injury] with associated manifestations of anxiety disorder and poor sleep architecture." AR039. Dr. Fredieu then briefly summarized the treatment Mr. Collins received at CBC. AR039–40.

At the conclusion of the letter, Dr. Fredieu expressed an opinion on Mr. Collins mental state at the time of his death. AR040. Dr. Fredieu noted that Mr. Collins denied any intention to commit suicide while he was at CBC. Id. Mr. Collins said that he would never do that to his family. Id. Dr. Fredieu then cited to a portion of the federal regulation that establishes the standard for determining if a service member's suicide constitutes "willful misconduct." 38 C.F.R. § 3.302. According to the regulation, a suicide is willful misconduct if it is "intentional;" however, "a person of unsound mind is incapable of forming an intent (mens rea, or guilty mind, which is an essential element of crime or willful misconduct)." Id. § 3.302(a)(1–2). Dr. Fredieu cited to the portion of the regulation on "Evidence of mental condition." Id. § 3.302(b). According to Title 38 of the Code of Federal Regulations, which govern Pensions, Bonuses, and Veterans' Relief,

> [w]hether a person, at the time of suicide, was so unsound mentally that he or she did not realize the consequence of such an act, or was unable to resist such impulse is a question to be determined in each individual case, based on all available lay and medical evidence pertaining to his or her medical condition at the time of suicide.

7

Id. § 3.302(b)(1). In Dr. Fredieu's opinion, "at the time of [Mr. Collins'] death he was not of sound mind enough to understand the finite nature of his action, at which point he was not cognitively in a position to resist/overcome his impulse to commit suicide." AR040. In support of this opinion, Dr. Fredieu reasoned that

> Many of David's exam findings, reports from his counseling sessions, as well as neurological consequences from incidents during his service, properly reported or not, are consistent with Traumatic Brain Injuries specifically decreased frontal and prefrontal function, as well as failure of some of his cognitive and brainstem inhibitory mechanisms. Prefrontal dysfunction is specifically associated with poor judgment, poor planning, preservation, poor executive function, dysregulated limbic (emotional) function, sensory dysfunction (mental and physical) ultimately altering his cognitive capabilities.

Id. Nothing in the letter indicates that Dr. Fredieu ever personally examined Mr. Collins. AR039–40; see also AR273 (a letter from counsel for Plaintiff stating that Dr. Fredieu's formed his opinion after he "reviewed . . . the raw data").

On April 8, 2014, Unum denied Ms. Collins' claim for benefits under the Supplemental Policy based on the suicide exclusion in that policy. AR141–44. Unum paid under the Basic Policy, which contains an identical exclusion. Compl. ¶ 90. Both exclusions apply to "any amounts of insurance for which [the policyholder] pays all or part of the premium." AR087; Basic Policy at 16, ECF No. 1-1, Ex. 1. Because Mr. Collins' employer, Blackbird, paid the premiums for the Basic Policy, the suicide exclusion in that policy did not apply. See Def.'s Mem. in Supp. of Summ. J. ("Def.'s Mem. in Supp."), ECF No. 33 at 7 n.4. Mr. Collins paid the premiums for the Supplemental Policy, and so Unum denied the claim under that policy.

On July 1, 2014, Ms. Collins through counsel informed Unum that she was appealing the denial of benefits. AR161. The same day, her counsel sent a twelve-page letter with fifty-five pages of exhibits. AR172–244. Ms. Collins made two arguments in support of her appeal: (1) that the suicide provision was invalid under Va. Code §38.2-3106(a), and (2) that because Mr.

Collins lacked the mental capacity to commit suicide, the suicide exclusion did not apply. AR173–184.

In support of her claim that Mr. Collins lacked the mental capacity to commit suicide, Ms. Collins submitted the following documents:

- A June 5, 2014 article from the NEW YORK TIMES, *War's Elite Tough Guys, Hesitant to Seek Healing,* that discusses the incidence of traumatic brain injury and post-traumatic stress disorder among former Special Operations forces. The article discusses the theory that frequent exposure to low-level blasts may cause substantial brain injury. It mentions the trouble that Special Operations soldiers have reentering civilian life and the rising rates of suicides among them. AR187–93.

- A military evaluation of Mr. Collins that rates him highly and marks him as "Must Promote." AR195–96.

- A declaration from Tarey Gettys, Mr. Collins' "Lieutenant and Platoon Commander/Officer in Charge of SEAL Team EIGHT." Mr. Gettys describes Mr. Collins' duties during his deployments. He also describes the high stress nature of Mr. Collins' particular position. He also notes that, while he did not notice Mr. Collins having problems sleeping, none of the SEALs slept very much while deployed. AR198–200.

- A declaration from Jon Fussell, who served with Mr. Collins on SEAL Team 10 from 2002–2004. He describes their deployment together, and Mr. Collins' sleep deprivation while deployed. AR202–03.

- A letter, dated April 8, 2014, from Robert Hines, PhD, a Clinical Psychologist at the Department of Psychology, Naval Medical Center Portsmouth, in Portsmouth, Virginia. Dr. Hines treated Mr. Collins on an out-patient basis on February 13, 2014. He diagnosed Mr. Collins with "Anxiety Disorder Not Otherwise Specified" and with "Depressive Disorder Not Otherwise Specified." Dr. Hines concluded that "the injuries he sustained throughout his career during combat and combat training, likely decreased his mental capabilities and made him susceptible to intense feelings of hopelessness and directly impacted his decision to end his life." AR205.

- The Autopsy Report by Dr. Babatunde Stokes, a forensic pathologist, who determined that the manner of Mr. Collins' death was "Suicide." AR 207–18.

- A declaration from Herbert Gordon Jr., "Ali," who served with Mr. Collins on SEAL Team 10 and worked with him at Blackbird. He describes the stresses of deployment, Mr. Collins' exposure to sub-concussive blasts, and Mr. Collins' sleep deprivation while deployed. He also relates that Mr. Collins changed in the months leading up to his death. According to Mr. Gordon, Mr. Collins was disengaged from his family and worried about his performance at work. AR220–22.

- The letter from Dr. Fredieu that was attached to the initial claim for benefits. AR224–25.

- A letter, dated June 17, 2014, from Dr. Daniel Perl, a professor of pathology at the Uniformed Services University of Health Sciences. Dr. Perl analyzed a specimen of Mr. Collins' brain. His "[e]xamination of the frontal lobes of the brain showed

focal accumulation of the protein *tau* in some nerve cells," an "abnormal finding" in a person of Mr. Collins' age. The "distribution pattern of nerve cells involved by *tau* accumulation [was] consistent with a diagnosis of . . . chronic traumatic encephalopathy or CTE." Dr. Perl described CTE as a progressive disorder. Mr. Collins' condition was "rather focal and mild." Dr. Perl could not determine whether "these pathologic findings [were] sufficient to explain some (even all) of the neurological/behavioral symptoms which [Mr. Collins] displayed during life." He explained that "[o]ur current understanding of CTE is based on a relatively small number of cases and the correlation between the extent and distribution of brain pathology and associated clinical manifestations during life is just beginning to be studied by laboratories, such as ours." AR240–41.

- A letter, dated June 29, 2014, from Dr. Robert Stern of the Boston University School of Medicine Alzheimer's Disease Center. Dr. Stern has studied and published extensively on CTE. Dr. Stern provided an opinion about Mr. Collins after reviewing certain records, including Dr. Perl's analysis of Mr. Collins' brain. He confirmed Dr. Perl's diagnosis of CTE and concluded that "at the time of his death, SOC Collins had degenerative brain disease that directly causes dramatic alterations in mood, impulse control, and judgment." AR 227–30.

- A declaration from Ms. Collins wherein she describes instances where Mr. Collins had become forgetful in the months leading up to his death. AR232.

- A therapy notes from Dr. Wade in which she describes her work with Mr. Collins. AR234–36.

11

- A treatment summary from Drs. Wade and Kaip, which reports Mr. Collins' Clinician Administered PTSD Scale (CAPS) score. His CAPS score of 57 fell in the "moderate to severe range." AR238.

Unum assigned Denise J. Laverriere to review the claim. AR165. To the above materials Unum added more of Mr. Collins' medical records and the text and email he sent before his death. AR254, 270–487. Unum also obtained Dr. McDermott's medical notes dated March 10, 2014 and his letter dated March 25, 2014. AR413–17. In this March 25, 2014 letter Dr. McDermott renders an opinion on Mr. Collins' mental state at the time of his death. AR417. Dr. McDermott writes

> It is my opinion, that David in no way understood the full ramifications of this action. He was not in the state of mind to understand the consequences. It is inconceivable that he would take such an egregious action, based upon his religious, military, and family background. Psychologically he was unstable and unable to perceive the ramifications of these actions. His actions on the day of his death imply there was no forethought, and th[at] he was acting on impulse and therefore could not comprehend the consequences of his actions. My visit notes stated that David tended to go into thought processes which tended to destabilize him. This is exactly my point that if David went into a process [which] destabilized him mentally, where he might take actions that are non-sensible or illogical. There would be no comprehension or understanding of consequences in such a mental state. Considering the magnitude of his action I think it speaks for itself, in no way did he comprehend what he was doing, or realize the consequences of his action.

Id.

The file was sent for clinical review to Susan L. Grover, RN. AR497–506. Unum then sent the filed to Dr. Jacqueline Crawford, a board certified neurologist, to evaluate whether Mr. Collins had CTE. AR512–19. She concluded that Mr. Collins' "past history [was] consistent with exposure to concussive forces on multiple occasions," that he has suffered a "progressive decline" in function, and that "[t]he medical evidence  support[ed] the diagnosis of CTE." AR518.

Dr. Crawford was also asked to assess if Mr. Collins was insane when he took his own life. Id. Specifically, she was asked to determine if the medical evidence established the following with regard to Mr. Collins, an inquiry that parallel's the Fourth Circuit's test for insanity[2]:

> 1. He was unable to understand the physical consequences of his act—i.e., he did not understand he was killing himself?
> 2. He was oblivious to the duties which he owed to his family, his friends and himself?
> 3. He was unable to understand the moral character of his action?
> 4. He was impelled to kill himself by an impulse that he was incapable of resisting?
> 5. He was so mentally unsound that he could not exercise a rational judgment on the question of life and death—i.e., he lacked the ability to make a meaningful choice between committing and not committing suicide?

AR518. Dr. Crawford declined to answer these questions because they crossed into the "realm of psychiatry." Id. She deferred to the reviewing psychiatrist. Id.

Unum then sent the file to Dr. Peter Brown, a board certified psychiatrist and Senior Medical Director at Unum.[3] AR522–27. Dr. Brown considered the same questions submitted to Dr. Crawford. AR525. He reviewed the file, which included the appeal and Mr. Collins' medical records, and Dr. Crawford's report. AR522–27. After review he concluded to a "reasonable degree of medical certainty" that the answer to all of the questions was no. Id.

In explaining this conclusion, Dr. Brown refers to the evidence on both sides. AR525–26. He began his analysis by acknowledging Dr. Crawford's finding that Mr. Collins had CTE. AR525. He added that "[f]rom a Psychiatric perspective, there is evidence to support severe insomnia disorder with comorbid cognitive, mood and anxiety disorders." Id. Dr. Brown noted that Mr. Collins had been voluntarily admitted to a "psychiatric hospital indicating clinical

---

[2] See Reinking v. Phila. Am. Life Ins. Co., 910 F.2d 1210, 1215 (4th Cir. 1990).
[3] The Curricula Vitae of Dr. Crawford and Dr. Brown have been attached to the back of the administrative record.

judgments that he was a possible acute danger to himself on the basis of impaired judgment concerning suicide." Id. Furthermore, his reports states that

> there is clear evidence of diminished capacity to make appropriate relevant judgments. Mr. Collins had diagnoses of [Traumatic Brain Injury] and unstable comorbid psychiatric condition. This combination is associated with a higher rate of suicide. . . . Additionally, Dr. Crawford noted significant sleep deprivation and hyponatremia (low blood sodium) that would have significantly contributed to impaired executive function (i.e. decreased judgment/increased impulsivity) at the time. There is no evidence of any sustained or significant improvement.

AR526.

> On the other hand, Dr. Brown, based on Mr. Collins' treatment records, reported that

> Multiple mental status examinations from a variety of clinicians over approximately 6 weeks consistently find the insured to be alert and oriented, responsive and cooperative. There was no evidence of disorientation, gross mental disorganization, loss of contact with reality, psychotic symptoms (delusions, hallucinations or formal thought disorder), impaired communication, apathy, impulsivity or loss of control of his thinking or behavior.

AR525. Dr. Brown also noted that Mr. Collins "consistently denied plans of suicide or fears that he would be unable to resist suicidal impulses." AR526. Dr. Brown considered the limited information available about the day of Mr. Collins' death. Id. Dr. Brown recounted that "there was documentation of communications he sent his wife and friend with apologies and requests that his children be cared for." Id. Dr. Brown considered that Mr. Collins "chose a means of high lethality and circumstances where he was unlikely to be observed or prevented from acting" and that "[t]he setting of his death was away from the family home." Id.

Ultimately, Dr. Brown found that although Mr. Collins' "ability to refrain or consider other options would have been impaired" this impairment was not "to the narrow extent implied by the questions." Id. He commented that the "[l]egal definitions of mental states relating to the legal concept of insanity are highly restrictive and somewhat archaic." Id. Dr. Brown concluded that Mr. Collins "was able to understand the physical consequences of his act;" that "[p]art of his

motivation appears to have been how he understood his duties to his family and his own personal code;" that "[h]e was able to make meaningful choices and resist impulses;" that "[h]e was not globally out of touch with reality i.e. not psychotic or delirious to an extent that he did not understand or control anything of what he was doing;" and, finally, that "[h]is suicide was planned and he was able to understand the immediate consequences of his actions." Id.

After review, with a letter dated October 10, 2014, Unum denied Ms. Collins' appeal of the denial of benefits. AR533–39. Unum provided alternative rationales for its denial. Id. First, Unum interpreted its plan as not requiring "an investigation into the insured's state of mind." AR537. If death results from a suicide, benefits are not payable. Id. Second, Unum determined that, to the extent that Mr. Collins' mental state was relevant, Mr. Collins "was not insane at the time he killed himself," nor was he "impelled to kill himself by an impulse he was incapable of resisting." Id. In its denial of her appeal, Unum did not address Ms. Collins' argument that the suicide provision was invalid under Virginia law. See AR533–39.

Ms. Collins filed the instant action on April 25, 2015. ECF No. 1. She alleges that the denial of benefits by Unum was an abuse of discretion and a breach of its fiduciary obligations. Compl. ¶¶ 103–06. She seeks payment in full of the Supplemental Policy. Id. at 17. She filed for summary judgment on December 23, 2015. ECF No. 30. Unum filed for summary judgment the same day. ECF No. 32. After briefing was completed a hearing on the cross motions was held on February 22, 2016. ECF No. 55.

## II.    STANDARD OF REVIEW

Both parties agree on the standard of review. When an employee benefit plan grants discretionary authority to determine whether to award a benefit to the plan administrator, the administrator's decision is granted deference and will be overturned only where the decision is an abuse of discretion. Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101 (1989). This

standard of review is premised on an understanding of plan administrators as trustees or fiduciaries who have been given authority to interpret the plan. See Carden v. Aetna Life Ins. Co., 559 F.3d 256, 261 (4th Cir. 2009). The contested policy in this case gives such authority to the plan administrator. AR113. The plan gives Unum "discretionary authority" to "determin[e] eligibility for benefits and the amount of any benefits, resolv[e] factual disputes, and interpret[e] and enforc[e] the provisions of the Plan." Id. Under the abuse of discretion standard, the reviewing court will not disturb a plan administrator's decision unless it is unreasonable. Evans v. Eaton Corp. Long Term Disability Plan, 514 F.3d 315, 322 (4th Cir. 2008) (citing Firestone, 489 U.S. at 111; Booth v. Wal-Mart Stores, Inc. Associates Health & Welfare Plan, 201 F.3d 335, 342 (4th Cir. 2000)). "[A]n administrator's decision is reasonable 'if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" Id. (quoting Bernstein v. CapitalCare, Inc., 70 F.3d 783, 788 (4th Cir. 1995)).

This definition of reasonableness may be further parsed into standards governing factual determinations and plan interpretations. A plan administrator's factual determinations must be supported by substantial evidence. The threshold for what constitutes substantial evidence has been described by the Fourth Circuit as "more than a scintilla but less than a preponderance." Newport News Shipbuilding & Dry Dock Co. v. Cherry, 326 F.3d 449, 452 (4th Cir. 2003) (quoting Norfolk Shipbuilding. and Drydock Corp. v. Faulk, 228 F.3d 378, 380–81 (4th Cir. 2000)). The Fourth Circuit has also described substantial evidence as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." DuPerry v. Life Ins. Co. of N. Am., 632 F.3d 860, 869 (4th Cir. 2011) (quoting LeFebre v. Westinghouse Elec. Corp., 747 F.2d 197, 208 (4th Cir. 1984)).

An administrator's interpretations of plan terms and applications of the plan terms to the facts must be upheld if they are reasonable. A reasonable interpretation is not necessarily the best one. See Carden, 559 F.3d at 263. *Contra proferentem*, a principle of contract interpretation frequently applied in the insurance context, does not apply to deferential reviews under ERISA. Carden, 559 F.3d at 260. *Contra proferentem*, a Latin phrase typically translated as "against the drafter" or "against the offeror," is the rule that ambiguous terms in an insurance contract should be interpreted against the drafter of the contract, which is almost always the insurance company. KENNETH S. ABRAHAM, INSURANCE LAW AND REGULATION 37 (5th ed. 2010). To apply this rule when an ERISA plan gives discretion to a plan administrator to interpret plan terms in the first instance is to deprive the administrator of this discretion.

In addition to these standards, the Fourth Circuit has identified the following non-exclusive list of factors to be considered when reviewing administrator decisions for abuse of discretion, the so-called "Booth Factors":

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

Carden, 559 F.3d at 261 (citing Booth, 201 F.3d at 342–43).

This last Booth factor, the fiduciary's motives and any conflict of interest it may have, requires further comment. The Fourth Circuit acknowledges the potential financial conflict of interest involved when a plan administer reviews a plan determination, and identifies this conflict of interest as a factor to be considered when reviewing the reasonableness of a plan determination. Carden, 559 F.3d at 261. However, this conflict of interest does not alter the

standard of review. <u>Conkright v. Frommert</u>, 559 U.S. 506, 512 (2010) (citing <u>Metro. Life Ins. Co. v. Glenn</u>, 554 U.S. 105, 115–17 (2008)). If this conflict did alter the standard of review, it would effectively transform abuse of discretion review into *de novo* review in almost all ERISA cases where a plan grants discretion to the plan administrator to determine eligibility for benefits as the conflict invariably arises in these cases. <u>Glenn</u>, 554 U.S. at 116.

Ultimately all these standards and factors are less descriptions of rigid rules to apply than they are expressions of a deferential approach to review. As the Fourth Circuit has put it, "[a]t its immovable core, the abuse of discretion standard requires a reviewing court to show enough deference to a primary decision-maker's judgment that the court does not reverse merely because it would have come to a different result." <u>Evans</u>, 514 F.3d at 322. In ERISA cases specifically the abuse of discretion standard

> protects important values: the plan administrator's greater experience and familiarity with plan terms and provisions; the enhanced prospects of achieving consistent application of those terms and provisions that results; the desire of those who establish ERISA plans to preserve at least some role in their administration; and the importance of ensuring that funds which are not unlimited go to those who, according to the terms of the plan, are truly deserving.

<u>Id.</u> at 323. With these values in mind, and exercising the deference necessary to preserve these values, the Court will now review the plan administrator's decision.

## III.   ANALYSIS

### A.   VALIDITY OF THE SUICIDE EXCLUSION IN THE SUPPLEMENTAL POLICY

First, before reaching the reasonableness of the plan administrator's decision, the Court must determine if the suicide exclusion in the Supplemental Policy is valid under Virginia Law. Plaintiff argues that the suicide exclusion is invalid because it does comply with Va. Code § 38.2-3106. Pl.'s Mem. in Supp. of Summ. J. ("Pl.'s Mem. in Supp."), ECF No. 31 at 19. Va. Code § 38.2-3106 provides that

A. Except as provided in subsection B of this section, the fact that an insured committed suicide, or was executed under law, shall not be a defense in any action, motion or other proceeding on a life insurance policy that (i) was issued to any person residing in this Commonwealth at the time of issuance, or (ii) is otherwise subject to the laws of this Commonwealth, to recover for the death of that person.

B. An express provision in the body of the policy limiting the liability of the insurer to an insured who, whether sane or insane, dies by his own act within two years from the date of the policy shall be valid but the insurer shall be obligated to return or pay at the least the amount of the premium paid for the policy.

Plaintiff argues that because the suicide exclusion in the supplemental policy lacks the specific phrase "whether sane or insane" it is not a valid defense to coverage. Pl.'s Mem in Supp. at 19.

ERISA has no bearing on this question of validity as suicide exclusions fall under the so-called "insurance exception" to ERISA preemption and accordingly are governed by state law. See Metro. Life Ins. Co. v. Mass., 471 U.S. 724, 742 n.18 (1985) ("Nearly every court that has addressed the question has concluded that laws regulating the substantive content of insurance contracts are laws that regulate insurance and thus are within the scope of the insurance savings clause."); Hoeflicker v. Cent. States, Se. & Sw. Areas Health Welfare Fund, 644 F.Supp. 195, 199 (W.D. Mo. 1986) (holding that a suicide exclusion "regulate[s] insurance" and therefore falls within the insurance savings clause). Because no Virginia case has directly confronted this issue, this Court, a federal tribunal, must predict how the Virginia Supreme Court would decide the issue.

The history, language, and purpose of Va. Code § 38.2-3106 all convince this Court that Virginia would uphold the validity of the suicide exclusion in the Supplemental Policy. The Court is guided in this analysis by circuit precedent. The Fourth Circuit considered a predecessor to Va. Code § 38.2-3106 in New England Mut. Life Ins. Co. v. Mitchell, 118 F.2d 414, 417 (4th Cir. 1941). In that case, the Fourth Circuit held that Virginia insurance law did not require

suicide exclusions to contain any "magic" words in order to be valid. New England Mut. Life Ins. Co. v. Mitchell, 118 F.2d 414, 417 (4th Cir. 1941). The predecessor statute, Section 4228 of the Virginia Code of 1936, provided that

> in any action, motion or other proceeding on a policy of life insurance . . . it shall be no defense that the insured committed suicide . . . provided, however that if there shall be an express provision in the body of such policy limiting the liability of the insurer in the event that the insured shall, within two years from the date thereof, die by his own hand (whether sane or insane), such provision shall be valid but the insurer shall be obligated to return, or pay, at the least, the amount of the premiums paid on account of such policy.

Id. at 416. The policy under review provided that

> If the insured, whether sane or insane, shall die by his or her own hand or act within two years from the date hereof this policy shall be void and shall have no value; but in such event the company will return any premium paid.

Id. It was argued that the policy language "this policy shall be void" did not limit the liability of the insurer as required by the statute but rather created "a mere condition subsequent," the breach of which would avoid the policy. Id. at 418. The Fourth Circuit rejected this distinction and held that "the suicide clause, whether it provides that the policy shall be void in case of suicide or that suicide is not a risk covered, is necessarily a limitation on coverage." Id.

The divergence from the language of the statute and the language of the policy in this case is of a different nature than in Mitchell. Accordingly, the result in Mitchell does not mandate the outcome here. However, the Fourth Circuit's opinion guides this Court with its persuasive analysis of the origin and purpose of Virginia's regulation of suicide exclusions. The Fourth Circuit began this analysis by asking what Section 4228 of the Virginia Code of 1936 was meant to accomplish. It noted that under the common law in Virginia there could be no recovery on a life insurance policy in case of suicide. Id. at 416 (citing Sec. Life Ins. Co. of Am. v. Dillard, 84 S.E. 656 (Va. 1915)). This common law rule obviously protected insurance

companies. It also served to discourage suicides. See Dillard, 84 S.E. at 656–58 (denying recovery on a life insurance policy to the widow whose husband committed suicide even though there was no suicide exclusion in the contract because of considerations of public policy). The effect of the statute was twofold: it "preserve[d] the common-law rule for the limited period of two years . . ."—maintaining a more limited protection for insurers—*and* required that policies provide notice to policyholders of the exclusion. See Mitchell, 118 F.2d at 416–17. Under the common law, a beneficiary would not be able to recover under a life insurance policy in the event of suicide even if the purchaser of the policy did not have notice of the rule. See Dillard, 84 S.E. at 657–58.

For the Fourth Circuit, as long as the policy provided sufficient notice of the exclusion— and the exclusion was limited to two years—it was valid under the statute. See id. at 417. As the court put it, "[t]he purpose of language is to convey thought" and there is no "magic in a particular phrase." Id. Insurance policies are contracts that memorialize the promise made by each party to the contract. Id. Whether the policy said that the policy limited liability in the event of suicide, or that the policy was void in the event of suicide, the effect was the same and readily apparent: there would be no recovery on the policy in the event of suicide. Id. at 418.

By contrast, in this case the phrase that Plaintiff insists must be in the insurance policy— "whether sane or insane"—does convey a thought absent from the exclusion in the Supplemental Policy. The phrase makes it indisputable that the suicide exclusion applies even if the deceased took his or her own life while insane, however sanity is defined. Nevertheless, the phrase does not necessarily change the substance of the exclusion. In the statute, the phrase "whether sane or insane" is contained within commas. In the Virginia Code of 1936, it had been placed in parentheses. See Mitchell, 118 F.2d at 416. Typically, appositive clauses contained within

commas are said to be "nonrestrictive." THE CHICAGO MANUAL OF STYLE § 6.23 (16th ed. 2010). A nonrestrictive clause "can be omitted without obscuring the identity of the noun to which it refers." Id. This punctuation suggests that the phrase "whether sane or insane" is non-essential to the meaning of the term suicide and need not be "express" within the exclusion. As will be discussed below it is reasonable to interpret the term suicide in the policy to mean any non-accidental self-inflicted death, regardless of mental state, even though the policy does not contain the phrase "whether sane or insane."

Nevertheless, punctuation alone does not decide this issue. The critical question is whether requiring the clarifying phrase "whether sane or insane" furthers the purposes of requirement that life insurance contracts contain an express suicide exclusion in order for those exclusions to be valid. One plausible purpose of this notice requirement is to discourage suicides. If a potential policyholders know that they cannot create a windfall for their families by purchasing insurance and then taking their own lives—or by taking their lives within two years of receiving coverage—they may be less likely to end their own lives. Additionally, and somewhat less plausibly, the requirement may be said to protect potential purchasers of insurance. They know when they buy insurance that their beneficiaries may not recover in the event of their suicide, and this may affect their decision to purchase life insurance.

It is difficult to see how requiring that the exclusion contain the phrase "whether sane or insane" would further either of these purposes. Absent the phrase, a policyholder or potential policyholder might conclude that the exclusion only limits the liability of the life insurer in the event of a "sane" suicide. But would this belief affect anyone's decision to either commit suicide or purchase life insurance? Would someone be more likely to take his own life in the belief that his beneficiaries might recover on the policy because he was found to be insane? Is the

availability of coverage for "insane" suicides something that affects the decision to purchase life insurance? Because of the unlikelihood of these scenarios, requiring that a policy contain the words whether sane or insane does not further the purpose of requiring an express suicide exclusion. Accordingly, the suicide exclusion is not void because it lacks the words whether sane or insane.

Another provision of Virginia law supports this conclusion. The Insurance Code of Virginia contains a savings clause which provides that "[a]ny insurance policy or form containing any condition or provision that is not in compliance with this title shall be valid, but shall be construed and applied in accordance with the conditions and provisions required by this title." Va. Code § 38.2-318(A). The precise application of this provision in the instant suit is complicated because of the standard of review. Because the ERISA policy at issue gives the insurer discretionary authority to decide whether to award a benefit, it is the duty of the insurer in the first instance to construe the policy language. This Court merely determines whether the insurer's interpretation of the plan was reasonable, and the insurer did not rely on this code provision in interpreting the suicide exclusion. However, it is the duty of this Court to decide whether the exclusion was valid under Virginia law. The saving clause indicates that, at the very least, that under Virginia law invalidation of policy provisions because of failure to strictly comply with the insurance code is disfavored.

Plaintiff argues that the savings clause should not be applied because it would prejudice her. Pl.'s Mem. in Opp'n to Def's Mot. for Summ. J. ("Pl.'s Mem. in Opp'n"), ECF No. 45, at 24–25. That is, if the suicide exclusion were modified to include the phrase "whether sane or insane" she would have no suit. She claims that in all of the cases cited by Defendant for the proposition that Virginia courts have modified insurance provisions to make them compliant

23

with the insurance code the policy revisions benefited the *insured*. Id. Of course, insureds generally do not object to nonconforming policy provisions that are favorable to them. Plaintiff's position is truly exceptional. She wants this Court to invalidate a provision of an insurance contract because it is more favorable to her than what she claims is required under Virginia law. It is not surprising that Defendant has not cited any cases where Virginia courts have confronted such a claim and then reformed policies to the detriment of an insured.

This peculiarity weighs against invalidating the suicide exclusion. Plaintiff's position is contrary to common sense. Plaintiff argues quite plausibly that the Virginia statute contains the phrase "whether sane or insane" because the Virginia legislature sought to eliminate suits like hers. It would be a strange result if her lawsuit were allowed to succeed solely because of a provision of a statute meant to preclude it. Plaintiff has suffered no harm on account of the contested insurance provision. As explained above, the policy as written gave sufficient notice to the policyholder of the suicide exclusion. Plaintiff's position rests entirely on verbal abstraction and ignores all considerations of policy and fairness. Because the suicide exclusion complies with the language, history, and purpose of Va. Code § 38.2-3106, it is valid under Virginia law.

## B.    THE PLAN ADMINISTRATOR'S APPEAL DECISION

In its appeal decision, Unum relied on two alternative justifications for denying the payment of benefits. AR535. First, Unum determined that its policy did "not distinguish between suicide while sane and suicide while insane." Id. In other words, Unum determined that all non-accidental, self-inflicted deaths were not covered by the policy regardless of the mental state of the insureds who take their own lives. Second, Unum determined that Mr. Collins was not insane at the time of his death and so even if his mental state were relevant it would nevertheless deny the claim. AR535–37. If either of these determinations was reasonable, this Court must uphold Unum's denial of benefits.

24

1.    **Was Unum's interpretation of the plan term "suicide" to mean all self-inflicted deaths reasonable?**

The suicide exclusion in the Supplemental Policy says merely that "[y]our plan does not cover any loses where death is caused by, contributed to by, or results from . . . suicide occurring within 24 months after your or your dependent's initial effective date of insurance." AR087. In its briefing on the cross motions for summary judgment, Unum says that it applied what is calls the "plain and ordinary meaning" of suicide in interpreting this provision. Def.'s Mem. in Supp. at 15. This interpretation of suicide encompasses any non-accidental, deliberate taking of one's own life, regardless of one's mental state. See Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. ("Def.'s Mem. in Opp'n"), ECF No. 44, at 11. Because it is undisputed that Mr. Collins deliberately shot himself in the head, Unum, applying this definition, denied life insurance benefits under the Supplemental Policy. AR534–35.

This Court will not assay the zeitgeist and determine what the "plain and ordinary" meaning of suicide is. The question for the Court is whether Unum's interpretation of the term suicide in the policy was reasonable. That said, uses of the term suicide in various contexts may support the reasonableness of Unum's plan interpretation. To interpret a term using a common definition of that term is not unreasonable. As Unum notes, the Office of the Chief Medical Examiner for the City of Virginia Beach determined that the manner of Mr. Collins' death was suicide. AR209, 214–16. Although the autopsy does not define suicide, the lack of a detailed account of Mr. Collins' mental state suggests that his mental state was irrelevant to this determination. Unum also cites an opinion from a Texas court that states that "[t]he broad, common, and accepted definition of suicide is simply 'the act of killing oneself intentionally.'" S. Farm Bureau Life Ins. Co. v. Dettle, 707 S.W.2d 271, 274 n.* (Tex. App. 1986) (quoting

Webster's New World Dictionary 1424 (Second College Edition 1980)).[4] Intentionally in this context means only non-accidentally. Id. at 274. Without a doubt, one common definition of suicide is any non-accidental, self-inflicted death.

Recent decisions in ERISA cases from a Federal Court of Appeals and a Federal District Court have upheld as reasonable plan administrators' determinations that the term suicide meant any non-accidental, self-inflicted death even though the suicide exclusions at issue did not include some variant of the phrase "whether sane or insane." McCorkle v. Metro. Life Ins. Co., 757 F.3d 452 (5th Cir. 2014); Riggs v. Metro. Life Ins. Co., 940 F.Supp.2d 172 (D. N.J. 2013).[5] In McCorkle, the decedent, who had been taking Lunesta, a sleep aid, for several nights, left his bed one night, went to his driveway, and shot himself in the head. 757 F.3d at 454–55. His life insurer, MetLife, who was given discretion to determine benefit eligibility, denied his widow's claim. In federal court, his widow argued that Lunesta had caused his behavior and that his "death was not a suicide because he did not have the requisite intent to cause his own death." Id. at 455. The district court accepted this contention; the Fifth Circuit reversed. Id. at 456–60. The Fifth Circuit emphasized the deferential standard of review and held that district judge "erred by substituting his own, narrower interpretation of the term 'suicide' in place of MetLife's reasonable, yet broader, interpretation." Id. at 459 (alterations and internal quotations omitted). "MetLife's determination that [the decedent's] non-accidental taking of his own life was a suicide was indisputably reasonable . . . ." Id.

---

[4] The suicide exclusion that was being interpreted in Dettle excluded coverage for death of the insured "by his own hand or act whether sane or insane." 707 S.W.2d at 272. Still, the Court's interpretation of the term suicide did not appear to rely on the phrase "whether sane or insane." See id. at 274.
[5] The suicide exclusion in McCorkle provided that "[i]f You commit suicide within 2 years from the date Life Insurance for You takes effect We will not pay such insurance and Our liability will be limited as follows: any premium paid by You will be returned to the Beneficiary." Br. of Defendants-Appellants at 6, 757 F.3d 452, No. 13-30754 (5th Cir. Oct. 30, 2013). The exclusion in Riggs was essentially identical. 940 F.Supp.2d at 175.

The facts in <u>Riggs</u> are roughly similar. The decedent had been taking a sequence of antipsychotic and antidepressant medications when early one morning he shot himself in his bedroom. 940 F.Supp.2d at 174–75. His wife appealed his insurer's initial denial of benefits, and the insurer, MetLife, denied this appeal. <u>Id.</u> at 177. Although the plan did not contain a "sane or insane" clause, the district upheld as reasonable MetLife's determination that the decedent's death by a self-inflicted gunshot wound was a suicide within the meaning of the policy. <u>Id.</u> 184–85. The district court held as such even though MetLife did not offer a "definitive definition of 'suicide.'" <u>Id.</u>

In her complaint, Plaintiff argues that "to the extent that 'suicide' is an ambiguous term, Mrs. Collins is entitled to benefits under the doctrine of *contra proferent[e]m*, which requires ambiguous language to be strictly construed in favor of the insured." Compl. ¶ 87. As discussed above, the doctrine of *contra proferentem* does not apply to a district court's review of plan administrator's interpretation of plan language when the ERISA plan has given discretion to the plan administrator to interpret the policy. As long as the plan administrator's interpretation is reasonable, this Court must uphold it.

In her response to Defendant's Motion for Summary Judgment, Plaintiff argues, as she must, that it was unreasonable for Unum to interpret the suicide exclusion to apply to insane suicide. Pl.'s Mem. in Opp'n at 12. There are still some contradictory statements about how the term suicide in the plan is ambiguous. <u>Id.</u> at 11–12. For the most part, however, Plaintiff focuses her argument on why the only reasonable interpretation of the suicide exclusion is that it does not extend to insane suicide. <u>Id.</u> at 11–16. Plaintiff cites various definitions of suicide in dictionaries, scholarly articles, insurance treatises, and court opinions that include an element of intent not met if the deceased was not of sound mind. <u>Id.</u> at 12–14. She cites two Supreme Court opinions

27

of rather mature vintage wherein the Court, applying Federal common law, interpreted suicide exclusions in life insurance policies not to exclude insane suicide. Id. at 14 (citing Conn. Mut. Life Ins. Co. v. Akens, 150 U.S. 468 (1893); Mut. Life Ins. Co. v. Terry, 82 U.S. 580 (1872)). Plaintiff also argues that all Unum had to do to make it indisputable that the suicide exclusion applied to insane suicide was add the phrase "whether sane or insane." Id. She notes that other life insurance policies issued by Unum contain similar phrases. Id. at 14–15. Taken together, all of this authority and argument might be persuasive if this Court were interpreting the suicide exclusion *de novo*. However, this Court's role is more limited, and none of this authority or argument is enough for this Court to hold that it was unreasonable for Unum to interpret the suicide exclusion to apply to all non-accidental, self-inflicted deaths. To so hold, this Court would have to disregard a common definition of suicide and go against a Federal Court of Appeals and a Federal District Court.

Plaintiffs' most compelling argument—her only argument that comes close to distinguishing McCorkle and Riggs—compares the suicide exclusion in the life insurance provisions of the Supplemental Policy to the suicide exclusion in the provisions governing the accidental death and dismemberment ("AD&D") insurance[6] that was also included in the Supplemental Policy purchased by Mr. Collins. In doing so, Plaintiff invokes the fourth Booth factor: whether the fiduciary's interpretation was consistent with other provisions in the plan. The AD&D insurance does not cover "any accidental losses caused by, contributed to by, or resulting from: suicide, self destruction while sane, intentionally self-inflicted injury while sane, or self-inflicted injury while sane, or self-inflicted injury while insane." AR097. Plaintiff argues that this provision shows that when Unum intended to exclude self-inflicted injuries, including

---

[6] The accidental death and dismemberment insurance covers both accidental death, in the event of which the benefit stacks with the life insurance benefit, and accidental dismemberment, such as losing a hand or eye. AR093–94.

death, that occur while the insured is insane it knew how to include language to that effect. Pl's Mem. in Opp'n at 15–16. A comparison of the two provisions, Plaintiff argues, shows that Unum chose to include coverage for insane suicides as part of the life insurance coverage in the Supplemental Policy. Id. Therefore, to interpret the suicide exclusion to exclude this coverage was unreasonable. Id.

The difficulty for Plaintiff is that this provision of the AD&D insurance contract does necessarily imply what she says it does and may imply the opposite. Ultimately, it is hard to draw any firm conclusions from the provision as it is not a model of draftsmanship. It is undoubtedly repetitive.[7] Whatever suicide means, it means at the very least "self destruction while sane."[8] It is Plaintiff's position that suicide only means self-destruction while sane. Why then does the policy say that it covers neither suicide nor self-destruction while sane? Similarly, any difference between "intentionally self-inflicted injury while sane" and "self-inflicted injury while sane" escapes this Court. As does the principle by which "or" is used. Yes, the provision makes explicit that the policy covers neither "self-inflicted injury while sane" nor "self-inflicted injury while insane." However, it does not say that it covers neither sane nor insane suicide. Although Plaintiff interprets self-inflicted injury while insane to include insane suicide, she does not explain why this is. The provision mentions suicide and self-destruction in addition to self-inflicted injury. It would be strange if Unum, as part of its AD&D coverage, did not provide coverage for self-inflicted injuries while insane but did cover insane suicides. However, that is a one reading of the provision if suicide means only suicide while sane. And so, if anything, this provision supports Unum's position that it was reasonable to interpret suicide to mean any non-accidental, self-inflicted death.

---

[7] Probably in response to the doctrine of *contra proferentem*.
[8] "Self-destruction" is a long-used synonym for suicide in life insurance policies. See Akens, 150 U.S. at 474 ("[T]he two words [suicide and self-destruction] are treated as synonymous in the very clause in question . . . .").

In sum, Unum's interpretation of suicide was reasonable.

**2.     Was Unum's determination that Mr. Collins was sane at the time of his death the result of a deliberate, principled process and supported by substantial evidence?**

Unum also determined that Mr. Collins was sane at the time of his death. AR535–37. Accordingly, it was appropriate to deny benefits even if the suicide exclusion in the policy only excluded sane suicides. Id. Unum's finding that Mr. Collins was sane was reasonable if it was the result of a deliberate, principled process and supported by substantial evidence.

The process by which Unum made this determination is described in more detail in the Background section that begins this opinion. See supra Part I, at 11–14. To summarize briefly, Unum put together a file consisting of Ms. Collins' appeal, Mr. Collins' medical records, the text and email he sent before his death, and the medical notes and letter of Dr. McDermott, a primary care physician that had seen Mr. Collins on three separate occasions. AR254, 270–487. This file was sent for review to a registered nurse, Susan Grover, to a board certified neurologist, Dr. Jacqueline Crawford, and to a board certified psychiatrist, Dr. Peter Brown. AR497–506, 512–19, 522–27. Dr. Brown was asked to determine if Mr. Collins was insane when he took his own life. AR522–27. This inquiry was guided by a set of questions that correspond to the Fourth Circuit's test for insanity. See AR525. Dr. Brown determined to a "reasonable degree of medical certainty" that the answer to all of the questions was no—that is, that Mr. Collins was not insane at the time of his death. AR525–26.

Unum then issued its appeal decision affirming the denial of benefits. AR533–39. In evaluating whether there is substantial evidence in support of Unum's finding that Mr. Collins was sane, it will be helpful to reference the Fourth Circuit's test for insanity that Unum used to formulate the questions at the center of Dr. Brown's inquiry and that Plaintiff relies on in her briefing. In this Circuit, "[a]n individual is relieved of responsibility for a given act if 'his

reasoning faculties are so far impaired that he is not able to understand the moral character, the general nature, consequences and effect of the act he is about to commit, or when he is impelled thereto by an insane impulse, which he has not the power to resist.'" Reinking v. Philadelphia Am. Life Ins. Co., 910 F.2d 1210, 1215 (4th Cir. 1990) (quoting Mut. Life Ins. Co. v. Terry, 82 U.S. 580, 591 (1873)). The Fourth Circuit has parsed this formulation into three types of insane individual: (1) "a person who is delusional or who does not understand the physical consequences of an act;" (2) person "who cannot appreciate the moral character of an act;" and (3) a person who suffers from "an 'insane' impulse that so overwhelms the will or rational thought that the individual is unable to resist" some desire to act. Id. at 1215–16.

In its appeal decision, Unum noted that no one who had seen Mr. Collins had found him to suffer from psychotic delusions. AR536. There is ample evidence in the record that Mr. Collins planned his suicide. He isolated himself in his car. AR216. He then informed others of his plan to commit suicide. Specifically, he texted his wife and emailed another former Navy SEAL, Mike Mansfield.[9] AR278, 282. Mr. Collins' lack of a history of psychotic delusions and his planning support a finding that he does not fit the first category of insanity because he knew the consequences of his actions: He knew that he was taking his own life. Additionally, in both the text to his wife and email to Mr. Mansfield, Mr. Collins expressed regret for his actions. AR278, 282. This regret shows that he understood not only the consequences of his actions, but also their moral character. Substantial evidence also supports a finding that Mr. Collins did not fit into the second category of insanity.

---

[9] Plaintiff argues that Mr. Mansfield was a mere acquaintance of Mr. Collins. Pl.'s Mem. in Supp. at 23. The record lacks any evidence as to the nature of the relationship between Mr. Collins and Mr. Mansfield. There is merely a letter from Plaintiff's counsel describing Mr. Mansfield as a distant acquaintance that lived 1500 miles away in Texas. AR271–72. Whatever Mr. Collins' motivation for choosing to email Mr. Mansfield, whatever their relationship, the email shows that Mr. Collins was considering the consequences and character of his actions.

It is the third category of insanity, the inability to resist an insane impulse, that Plaintiff relies on in her briefing. See Pl.'s Mem. in Supp. at 22. However, substantial evidence in the record supports Unum's conclusion that Mr. Collins did not fall into this category. None of those who treated Mr. Collins noted an issue with impulse control. When Mr. Collins was admitted voluntarily for inpatient psychiatric treatment, his mental status exam noted that "[i]mpulse control was good." AR463. Mr. Collins' planning prior to his death also supports Unum's finding that Mr. Collins was not suffering from an insane impulse. For instance, in his text to his wife, in addition to apologizing to her and telling her that he loved her, he also told her that she would need to pick up their son. AR282. It was not an abuse of discretion for Unum to interpret such planning as the acts of a man who made a choice to end his life rather than those of a man suffering from an insane impulse. A planned action is the antithesis of an impulsive one.

Plaintiff focuses much of her briefing on the inadequacies of Dr. Brown's review. Pl.'s Mem. in Supp. at 21–24. Plaintiff alleges that Unum relied "solely on the report of Dr. Brown" in denying her appeal. Id. at 21. She faults Dr. Brown for reviewing an inadequate amount of material, which invokes the third Booth factor. Id. Dr. Brown looked at the entire administrative record up to the portion that consists of his report. AR523–27. Within this record are all the materials that Plaintiff submitted with her appeal as well as the material Unum added. Plaintiff faults Dr. Brown for not further supplementing this record with calls to treating physicians and friends of Mr. Collins. Pl.'s Mem. in Supp. at 21. However, the medical records of Mr. Collins and declarations from his friends were included with the appeal. Dr. Brown reviewed an extensive record about Mr. Collins, and he references in his report various medical findings about Mr. Collins, such as that he had CTE. AR525–27. His review was more than adequate.

Plaintiff also faults Dr. Brown because his view that Mr. Collins was sane conflicts with the opinions of other medical professionals such as Dr. Fredieu and Dr. McDermott. Pl.'s Mem. in Supp. at 22. These other medical opinions are not unassailable. Defendant in its briefing responds to each of the medical professionals identified by Plaintiff. Def.'s Mem. in Opp'n at 17–22. However, it is not the role of this Court to weigh the evidence for and against Mr. Collins' sanity. This is abuse of discretion review, and it is not an abuse of discretion for an insurer to choose among conflicting medical opinions. Booth, 201 F.3d at 345.

Plaintiff also invokes other Booth factors. She notes that Dr. Brown was operating under a conflict of interest, the eighth Booth factor, because he is an employee of Unum. Pl.'s Mem. in Supp. at 26–27. This is true of course. Nevertheless, there was substantial evidence in the record supporting Unum's finding that Mr. Collins was sane, and the conflict of interest does not change this standard of review. Plaintiff also faults Unum for lacking any standards to guide its appeal specialists, implicating the fourth Booth factor. Pl.'s Mem. in Supp. at 25. At the hearing on the instant cross motions for summary judgment, Plaintiff's counsel was more specific as to what standard Unum lacked. See Hr'g, ECF No. 55. Plaintiff's counsel faulted Unum for lacking any working definition of insanity. Id. This contention is misleading. As mentioned earlier, the questions posed to Dr. Brown about Mr. Collins' mental state correspond to the same Fourth Circuit test for insanity that Plaintiff cites in her briefing.

In sum, Unum reviewed all the material Plaintiff sent to it. Dr. Brown, a board certified psychiatrist reviewed the file and commented on all the findings made by other medical professionals. Based on Dr. Brown's report and the evidence before it, Unum determined that Mr. Collins was sane. This finding was the result of a deliberate, principled process and supported by substantial evidence.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment, ECF No. 32, and **DENIES** Plaintiff's Motion for Summary Judgment, ECF No. 30. The present action is **DISMISSED**.

The Clerk is **DIRECTED** to forward a copy of this Order to all Counsel of Record.

**IT IS SO ORDERED**.

UNITED STATES DISTRICT JUDGE

Norfolk, VA
May 6, 2016

34